**KALIELGOLD PLLC**
Sophia Goren Gold (SBN 307971)
*sgold@kalielgold.com*
950 Gilman Street, Suite 200
Berkeley, California 94710
Telephone: (202) 350-4783

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (SBN 238293)
*jkaliel@kalielpllc.com*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telelphone: (202) 350-4783

**SHAMIS & GENTILIE, P.A.**
Andrew Shamis (*pro hac vice* to be filed)
*ashamis@shamisgentile.com*
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone : (305) 479-2299

**EDELSBERG LAW, P.A.**
Scott Edelsberg (SBN 330090)
*scott@edelsberglaw.com*
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Tel: 305-975-3320
Fax: 786-623-0915

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JASMINA GUTIERREZ, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PNC BANK,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

1

**CLASS ACTION COMPLAINT**

Plaintiff Jasmina Gutierrez on behalf of herself and all others similarly situated brings this class action complaint against Defendant PNC Bank, and alleges the following:

**INTRODUCTION**

1. Plaintiff brings this action on behalf of herself, the general public, and a class of similarly situated accountholders against Defendant PNC Bank ("PNC Bank"), arising from its failure to abide by the federal Electronic Funds Transfer Act's requirement to fully, fairly and accurately disclose the contours of its overdraft service, including circumstances in which it will assess overdraft and/or insufficient funds fees.

2. The reason PNC has chosen to ignore EFTA's requirements is simple: it prefers its customers do not know about the myriad OD/NSF Fee maximization policies it has used for the last decade—including policies regulators have expressly condemned.

3. For example, for years PNC has assessed OD Fees on debit card transactions that were authorized on a positive balance but settled on a negative balance ("APSN"). This is a practice that federal regulators have condemned as deceptive, fee maximizing and unconscionable. Indeed, as of October 2022, the CFPB has warned financial institutions that the charging of these APPSN fees may "trigger liability" under the Consumer Financial Protection Act. See also October 2022 CFPB Guidance (**Ex. 1**); see also April 2023 OCC Guidance (**Ex. 2**); April 2023 FDIC Guidance (**Ex. 3**). Yet, PNC never told its customers about its choice to use this practice in its Regulation E disclosures, even though this practice is an essential part of any full and fair disclosure about the Bank's overdraft service.

4. As another example, PNC has chosen to assess multiple NSF and OD Fees on the same item when it is reprocessed again and again by the Bank. Recently, the FDIC published guidance cautioning that the practice "may be deceptive." *March 2022 FDIC Guidance*, (**Ex. 4**); *August 2022 FDIC Guidance* (**Ex. 5**). Yet, PNC never told its customers about its choice to use this practice in its Regulation E disclosures, even though this practice is an essential part of any full and fair disclosure about the Bank's overdraft service.

5. Pursuant to Regulation E of the EFTA, Plaintiff was entitled to know all the machinations PNC would use to assess OD and NSF Fees in its overdraft service. PNC failed to inform Plaintiff of the same.

**CLASS ACTION COMPLAINT**

6. PNC systematically fails to provide with Regulation E's requirements by providing consumers with a vague, ambiguous, and misleading description as to how the Bank will assess overdraft and NSF fees.

7. On behalf of herself and the Classes, Plaintiff seeks damages, restitution, statutory damages, and attorneys' fees for Defendant's violations as set forth more fully below.

8. Because PNC's conduct is continuing, Plaintiff also seeks to enjoin PNC from continuing to mislead current and prospective accountholders regarding its OD and NSF fee assessment practices.

9. Finally, Plaintiff seeks declaratory relief on behalf of herself and the Classes pertaining to PNC's recent attempt to foist a new, more onerous arbitration provision onto class members. Specifically, PNC has recently attempted to change its arbitration provision in a manner that is substantially less favorable to consumers. Under PNC's new arbitration provision, Plaintiff and class members are therefore provided with an opportunity to opt out of arbitration altogether. PNC, however, affirmatively misled Plaintiff and other consumers as to their ability to opt out of the new arbitration provision. Plaintiff therefore seeks declaratory relief clarifying Plaintiff's and other class member's rights under PNC's new arbitration provision.

**PARTIES**

10. Plaintiff is a citizen and resident of Fremont, California, and a PNC Bank checking account holder. Plaintiff incurred an overdraft fee on a non-recurring debit card transaction in February 2022. On or before January 2023, Plaintiff initiated arbitration proceedings against PNC. While that arbitration was pending, PNC updated its arbitration provision to be significantly less favorable to accountholders and provided accountholders like Plaintiff an opportunity to opt out of arbitration altogether. Copies of the old and new arbitration provisions are attached hereto as **Exhibits 6 and 7**. For avoidance of all doubt, **Plaintiff hereby opts out** of PNC's arbitration provision and class action waiver and elects to pursue her claims in Court.

11. Defendant PNC Bank is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Class. PNC Bank has its headquarters in Pittsburg, Pennsylvania.

///

**JURISDICTION AND VENUE**

12. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class are comprised of at least 100 members; (2) at least one member of the proposed class resides outside of California; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs. Additionally, this Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because PNC is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

**PNC FAILS TO FULLY AND FAIRLY DISCLOSE ITS OVERDRAFT AND INSUFFICIENT FUNDS FEE MAZIMIZATION PRACTICES AND SO VIOLATES REGULATION E**

14. Overdraft fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.

15. In reaction to banks and credit unions taking advantage of millions of customers throughout the country through the unfair and fraudulent practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged to primarily the poorest of customers, while misrepresenting the nature of these practices, a substantial amount of litigation on these issues have occurred over the past few years. The results of this litigation include a trial verdict in California and nationwide settlements wherein banks and credit unions have been ordered or have agreed to pay unfairly assessed overdraft fees back to their customers in an amount in the hundreds of millions of dollars as well as changes in their overdraft practices.

16. Furthermore, the federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted a

Regulation E governing the ability of financial institutions to charge overdraft and NSF Fees. 12 C.F. R. § 1005.17.

17. The intent and purpose of the regulation is to "assist customers in understanding how overdraft services provided by their institutions operate ... by explaining the institution's overdraft service ... in a clear and readily understandable way"- as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank* (USA), 2016 U.S. Dist. LEXIS 41487, *11 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

18. PNC has totally failed to explain its overdraft service to its accountholders in a readily understandable way.

19. For example, PNC fails to disclose the Bank's practice of charging OD Fees on what are known as Authorize Positive, Purportedly Settle Negative Transactions, or "APPSN Transactions."

20. Here's how it works: at the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Defendant has already sequestered these funds for payment. However, Defendant still assesses OD Fees on many of these transactions.

21. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN transactions.

22. Defendant maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card,

Defendant sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

23. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

24. That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

25. Still, despite keeping those held funds off-limits for other transactions, Defendant improperly charges OD Fees on those APPSN Transactions, although the APPSN transactions always have sufficient available funds to be "covered."

26. Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

///

> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 Supervisory Highlights, 8–9 (available at https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf).

27. The CFPB recently released additional critique of this exact practice:

> Unanticipated overdraft fees can occur on "authorize positive, settle negative" or APSN transactions, when financial institutions assess an overdraft fee for a debit card transaction where the consumer had sufficient available balance in their account to cover the transaction at the time the consumer initiated the transaction and the financial institution authorized it, but due to intervening authorizations, settlement of other transactions (including the ordering in which transactions are settled), or other complex processes, the financial institution determined that the consumer's balance was insufficient at the time of settlement. These unanticipated overdraft fees are assessed on consumers who are opted in to overdraft coverage for one-time debit card and ATM transactions, but they likely did not expect overdraft fees for these transactions.
>
> …
>
> Certain financial institution practices can exacerbate the injury from unanticipated overdraft fees from APSN transactions by assessing overdraft fees in excess of the number of transactions for which the account lacked sufficient funds. In these APSN situations, financial institutions assess overdraft fees at the time of settlement based on the consumer's available balance reduced by debit holds, rather than the consumer's ledger balance, leading to consumers being assessed multiple overdraft fees when they may reasonably have expected only one.

Consumer Financial Protection Bureau, Circular 2022-06, October 26, 2022, https://files.consumerfinance.gov/f/documents/cfpb_unanticipated-overdraft-fee-assessment-practices_circular_2022-10.pdf, pp. 8-9, 10.

28. Additionally, both the OCC and FDIC have recently issued guidance cautioning that the same APPSN fee practice used by PNC may be deceptive and contrary to federal law. See *April 2023 OCC*

*Guidance* (**Ex. 3**); *April 2023 FDIC Guidance* (**Ex. 3**).

29. This abusive practice is not universal in the banking industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—does not charge OD Fees on APPSN transactions.

30. Under Regulation E, a financial institution may decide to assess overdraft fees on APPSN transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood. As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the assessment of fees on APPSN transactions must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions. Either inaccurately or failing to describe the assessment of overdraft fees on APPSN transactions violates the plain language of Regulation E.

31. A copy of PNC's overdraft disclosure is attached hereto as **Exhibit 8**. As demonstrated therein, PNC states merely that, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."

32. But this statement is misleading. By charging fees on APPSN transactions, PNC charges overdraft fees on transactions that <u>do</u> have "enough money" the account to "cover a transaction."

33. Moreover, by repeatedly promising that an overdraft occurs when the Bank "authorizes and pays" overdrafts, PNC misleadingly conflates the authorization of a debit card transaction with the settlement of a debit card transaction, and further obfuscates its assessment of overdraft fees on APPSN transactions.

34. The opt-in disclosure agreement did not accurately and in a clear and easily understandable way describe what constitutes an overdraft and under what circumstances the customer would be assessed an overdraft fee, and as such the opt-in disclosure agreement did not comply with Regulation E's requirements.

35. Because PNC uses an opt-in disclosure agreement that does not accurately describe its overdraft practices and thus is not compliant with Regulation E, PNC is not permitted to charge customers overdraft fees.

36. At all relevant times, PNC charged Plaintiff and the putative class overdraft fees on one-time debit card and ATM transactions even though it had not complied with Regulation E to first obtain customers' affirmative consent using a Regulation E compliant opt-in disclosure agreement before it charged these fees.

37. Based on information and belief, PNC continues to fail to provide an accurate description of its overdraft service.

38. As another example, PNC has chosen to assess multiple NSF and OD Fees on the same item when it is reprocessed again and again by the Bank. This practice often results in a single transaction being assessed *both* OD and NSF Fees, or a single transaction being assessed multiple NSF Fees.

39. Unbeknownst to consumers, when Defendant reprocesses an electronic payment item, ACH item, or check for payment after it was initially rejected for insufficient funds, Defendant chooses to treat it as a new and unique item that is subject to yet another fee. But Defendant's Regulation E disclosure never states that this counterintuitive and deceptive result could be possible.

40. The Federal Deposit Insurance Corporation (the "FDIC") has expressed concern with the practice of assessing multiple fees on an item. In 2012, the FDIC determined that one bank's assessment of more than one NSF Fee on the same item was a "deceptive and unfair act." In the Matter of Higher One, Inc., Consent Order, Consent Order, FDIC-1 1-700b, FDIC-1 1-704k, 2012 WL 7186313. 80.

41. This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed. Instead, Chase charges one fee even if an item is reprocessed for payment multiple times.

42. Yet PNC never disclosed this practice either in its Regulation E disclosures, preferring instead to keep its customers in the dark.

43. These practices are offered as examples. PNC undertakes many other, undisclosed, practices to maximize OD Fees as well.

## CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality,

typicality, adequacy, predominance and superiority requirements of Rule 23. The proposed Classes are defined as:

> All PNC consumer checking account holders who, within the applicable statute of limitations preceding the filing of this action, incurred overdraft fees or NSF Fees. ("Regulation E" Class)

> All PNC consumer checking account holders in the state of California who, within the applicable statute of limitations preceding the filing of this action, incurred overdraft or NSF Fees ("the UCL" Class)

45. Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

46. Also excluded from the Classes is any accountholder that is currently in arbitration proceedings with Defendant.

47. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

48. *Numerosity of the Class:* The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to PNC Bank's records. PNC Bank has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

49. Defendant has a database, or other documentation, of its customers' transactions and account enrollment documents. These databases or documents can be analyzed by an expert to ascertain which of Defendant's customers have been harmed by its practices and thus qualify as Class members. Further, the Class definitions identify unnamed Plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify themselves as having a right to recover damages from Defendant. Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to Class members through notice published in newspapers or other publications.

50. *Commonality:* The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because PNC Bank has acted on grounds generally applicable to the class. Such common legal or factual questions include, but are not limited to:

    a) Whether Defendant implemented an overdraft program without affirmative consent by customers in violation of Regulation E;

    b) Whether Defendant's conduct violated the UCL;

    c) The appropriate measure of damages.

51. *Typicality:* Plaintiff's claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by PNC Bank, as described herein. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and Class members are substantially the same because the relevant agreements between Defendant and its accountholders were identical as to all relevant terms, and also because the challenged practices are uniform for Plaintiff and Class members. Accordingly, in pursuing their own self-interest in litigating the claims, Plaintiff will also serve the interests of the Class.

52. A class action provides a fair and efficient method for adjudication of this controversy pursuant to Rule 23. Specifically:

    a) Trying these actions separately would create a risk of inconsistent and incompatible adjudications with respect to individual members of the Class;

    b) No litigation has been commenced by or against members of the class involving the same issues;

    c) Common questions of law and fact predominate over any questions affecting individual members;

    d) Somerset County is an appropriate forum for the litigation of the claims of the entire class;

    e) The class is numerous enough to render joinder of all members or the maintenance of separate suits impracticable, and the difficulties likely to be encountered in the management of this action as a class action are minimal;

        f)      Defendants have refused to act on grounds generally applicable to the class.

53. *Adequacy:* Plaintiff is a more than adequate representative of the Class pursuant to Rule 23 in that Plaintiff is a PNC Bank checking accountholder and has suffered damages as a result of PNC Bank's contract violations. In addition:

        a)      Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

        b)      There is no conflict of interest between Plaintiff and the unnamed members of the Class;

        c)      Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

        d)      Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

54. *Predominance and Superiority:* The matter is properly maintained as a class action under Rule 23 because the common questions of law and fact identified herein, and to be identified through discovery, predominate over questions that may affect only individual Class members. Further, a class action is superior to all other available methods for the fair and efficient adjudication of this matter because the injuries suffered by the individual Class members are relatively small. As such, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of law and fact.

55. Plaintiff knows of no difficulty to be encountered in the management or maintenance of this action that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this action. Absent a class action, Plaintiff and Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

56. PNC Bank has acted or refused to act on grounds generally applicable to the class, thereby making appropriate corresponding declaratory relief with respect to the Class as a whole.

57. All conditions precedent to bringing this action have been satisfied and/or waived.

### COUNT I
### VIOLATION OF THE EFTA (REGULATION E), 12 C.F.R. § 1005, *et seq.*;
### AUTHORITY DERIVED FROM 15 U.S.C. § 1693, *et seq.*
### (On Behalf of Plaintiff and the Regulation E Class)

58. Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

59. PNC Bank charged Plaintiff overdraft fees as a result of ATM and non-recurring debit card transactions.

60. PNC Bank failed to provide Plaintiff disclosures that fully and accurately described PNC Bank's overdraft service – i.e., the service under which PNC Bank would assess overdraft and NSF fees. PNC Bank failed to provide Plaintiff a segregated, non-misleading and truthful description of its practices, as part of the overdraft service, in assessing overdraft and NSF fees, as required by 12 C.F.R. § 1005.17.

61. The "primary objective" of Regulation E (12 C.F.R. §§1005 et seq.) is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

62. Due to PNC Bank's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and all members of the Class are entitled to, and do seek, actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

///

///

///

# COUNT II
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (On behalf of Plaintiff and the UCL Class)

63. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

64. PNC Bank's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq*.

65. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

66. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable and sweeps within its scope acts and practices not specifically proscribed by any other law.

67. PNC Bank's conduct violates the UCL by failing to disclose the contours of its overdraft service in violation of Regulation E.

68. PNC Bank committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200*, et seq*., by implementing an overdraft program without affirmative consent by customers in violation of federal regulations

69. Specifically, PNC Bank's conduct was not motivated by any business or economic need or rationale. The harm and adverse impact of PNC Bank's imposition of overdraft and NSF fees without customers' affirmative consent was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

70. The harm to Plaintiff and members of the Class arising from PNC Bank's unfair practices relating to the imposition of overdraft and NSF fees customers did not affirmatively consent to outweighs the utility, if any, of those practices.

71. PNC Bank's unfair business practice relating to charging overdraft and NSF fees without customers' affirmative consent is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or

substantially injurious to Plaintiff and Class members.

72. PNC Bank's conduct was substantially injurious to accountholders in that they have been forced to pay overdraft fees that they did not consent to.

73. As a result of PNC Bank's violations of the UCL, Plaintiff and members of the Class have paid, and/or will continue to pay overdraft fees that they did not affirmatively consent to and thereby have suffered and will continue to suffer actual damages.

74. Plaintiff has no adequate remedy at law in part because PNC's conduct is continuing. Plaintiff therefore seeks an injunction on behalf of the general public to prevent PNC from continuing to assess overdraft fees on one-time debit card and ATM transactions without affirmative consent.

## COUNT III
### DECLARATORY RELIEF
### 28 U.S.C. § 2201(a)
**(On behalf of Plaintiff and the Classes)**

75. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

76. There exists a present controversy between the parties as to the following issues: (1) Whether existing accountholders have the right to opt out of PNC's arbitration provision because it is a "substantive" change from PNC's previous arbitration provision; (2) Whether PNC Bank's new arbitration provision was misleading because it deceived consumers as to the aforementioned right to opt out of the provision.

77. Accordingly, Plaintiffs and the members of the Classes hereby request the Court issue an order declaring that:

    a) All existing PNC Bank accountholders have the right to opt out of PNC Bank's new arbitration provision because it is a "substantive" change from the previous arbitration provision; and

    b) PNC Bank's new arbitration provision was misleading insofar as it failed to accurately inform accountholders of their right to opt out of the arbitration provision.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A. Certification for this matter to proceed as a class action on behalf of the Class pursuant to Rule 23;

B. Appointing the Plaintiff as representative of the Class, and appointing counsel for Plaintiff as Lead Counsel for the Class;

C. Finding PNC Bank's overdraft fee policies and practices to be in violation of Regulation E and the UCL;

D. Restitution of all overdraft fees improperly paid to PNC Bank by Plaintiff and the members of the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

E. Actual damages in an amount according to proof;

F. Statutory damages as allowed by law;

G. Awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

H. Awarding costs and attorneys' fees under the common fund doctrine, and all other applicable law;

I. Declaratory and injunctive relief; and

J. Such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: June 29, 2023            **KALIEL GOLD PLLC**

By: *Sophia Goren Gold*
Sophia G. Gold
Jeffrey D. Kaliel

*Attorneys for Plaintiff and the Putative Class*